IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Angelena S.,[1]                  )        C/A No.: 1:22-1022-SVH
                                 )
              Plaintiff,         )
                                 )
     vs.                         )
                                 )        ORDER
Kilolo Kijakazi, Acting          )
Commissioner of Social Security  )
Administration,                  )
                                 )
              Defendant.         )
_____  )

    This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated April 4, 2022, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

    Plaintiff brings this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On February 17, 2020, Plaintiff protectively filed an application for DIB in which she alleged her disability began on January 20, 2019. Tr. at 87, 191–94. Her application was denied initially and upon reconsideration. Tr. at 112–15, 119–22. On July 27, 2021, Plaintiff had a hearing by teleconference before Administrative Law Judge ("ALJ") Jerry Peace. Tr. at 34–70 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 3, 2021, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 30, 2022. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 44. She completed high school. *Id.* Her past relevant work ("PRW") was as a weaver.

Tr. at 45. She alleges she has been unable to work since January 20, 2019. Tr. at 191.

### 2. Medical History

On May 10, 2018, Plaintiff presented to the emergency room ("ER") at Spartanburg Medical Center ("SMC") for worsening left posterior neck pain. Tr. at 322. The attending physician noted pinpoint paraspinal tenderness of the cervical spine and palpable tenderness to the left trapezius muscle with muscle spasm. Tr. at 323. X-rays of Plaintiff's cervical spine showed mild scoliosis and degenerative narrowing of the disc spaces and respective bilateral neural foramina at C4–5, C5–6, and C6–7. Tr. at 323.

Plaintiff presented to nurse practitioner Candace Gregory Malone ("NP Malone") to establish care on July 24, 2018. Tr. at 319. She complained of cervical and lower lumbar pain and frequent headaches. *Id.* She described pain that woke her during the night and difficulty getting in and out of a tub or shower. *Id.* She indicated she was "pulling away from everyone" and "stooping into a depression." *Id.* NP Malone noted tenderness, bony tenderness, and spasm in the trapezius area of Plaintiff's cervical spine and decreased range of motion ("ROM"), tenderness, and spasm in her lumbar spine. Tr. at 320. She referred Plaintiff to a neurosurgeon for further evaluation and prescribed Lexapro 10 mg for anxiety and depression. Tr. at 320, 321.

3

On December 21, 2018, Plaintiff complained of a pinching sensation in her neck. Tr. at 314. Nurse practitioner Jennifer A. Melegari ("NP Melegari") noted muscle spasm and tenderness of the left cervical area. Tr. at 315. She prescribed Promethazine 12.5 mg, Methocarbamol 500 mg, and ibuprofen 800 mg and instructed Plaintiff to continue to use heat and to apply Icy Hot with lidocaine, Salonpas, or Bengay. Tr. at 316.

Plaintiff presented to orthopedic surgeon Chi Hun Lim, M.D. ("Dr. Lim"), for evaluation of neck and back pain on March 4, 2019. Tr. at 474. She described ongoing pain over a two-year period that had increased in intensity and noted her neck pain was more bothersome than her back pain. *Id.* She indicated she had posterior neck pain that radiated into the middle of her skull and low back pain that radiated into the right buttock and occasionally to the lateral hip. *Id.* She noted ibuprofen caused her gastrointestinal upset and Tramadol provided no relief. *Id.* She indicated her pain was exacerbated by activity and housework and she required frequent changes of position. *Id.* Dr. Lim observed Plaintiff to walk with a normal gait, to have 5/5 strength and intact sensation to light touch in the upper and lower extremities, to be neurovascularly intact, to have equal and appropriate reflexes, and to be diffusely tender to palpation ("TTP") over the cervical and lumbar spinous processes and paraspinals. Tr. at 476. He noted x-rays showed C2–3 spondylolisthesis, minimal C3–4 spondylolisthesis, degenerative changes and

4

loss of lordosis from C2 through C6, and degenerative changes with facet arthropathy from L2 through S1. Tr. at 476. He assessed neck and low back pain, cervical spondylolisthesis, and degenerative disc disease ("DDD") and referred Plaintiff to physical therapy. *Id.* He replaced Robaxin with Tizanidine 4 mg. *Id.*

Plaintiff participated in physical therapy for neck and back pain in March and April 2019. Tr. at 298–314. Upon initial evaluation, she demonstrated decreased ROM of her cervical spine to flexion, bilateral side bending, and bilateral rotation. Tr. at 311. She had decreased bilateral upper extremity ("BUE") strength to shoulder flexion, scaption, and external rotation and decreased bilateral lower extremity ("BLE") strength to hip flexion and extension. Tr. at 311–12.

Plaintiff returned to Dr. Lim on April 8, 2019. Tr. at 471. She indicated physical therapy had worsened her pain and described low back pain that radiated into her right buttock and proximal right lateral thigh and tingling in her right foot. *Id.* She stated her pain was exacerbated by lying and standing for prolonged periods. *Id.* She also described posterior neck pain that radiated into the middle of her skull. *Id.* Dr. Lim observed Plaintiff to be diffusely TTP over the cervical and lumbar spinous processes and paraspinals, but to demonstrate intact sensation to light touch and 5/5 strength throughout her BUE and BLE. Tr. at 473. He encouraged Plaintiff

to continue with physical therapy and provided a note authorizing the physical therapist to use ultrasound and a transcutaneous epidural nerve stimulation ("TENS") unit. *Id.* He ordered magnetic resonance imaging ("MRI") of the lumbar and cervical areas of Plaintiff's spine. *Id.*

Plaintiff reported minimal improvement to her pain and demonstrated similarly reduced ROM upon discharge from physical therapy on April 16, 2019. Tr. at 299, 300.

Plaintiff underwent an MRI of the lumbar spine on April 24, 2019. Tr. at 363. It showed extrusion to the right at the L2–3 level with moderate canal narrowing and mild right neural foraminal narrowing; mild canal narrowing and mild right neural foraminal narrowing at L3–4 with a far-right displaced protrusion at the right L3 root; and a far-right protrusion abutting the right L4 root. Tr. at 365.

Plaintiff underwent an MRI of the cervical spine on the same day. Tr. at 362. It showed minimal spotty increased signal on T2 from the C3 level to the C7 level; disc-osteophyte complex and facet hypertrophy with some impingement on the anterior cord at C3–4; some flattening of the anterior surface of the cord with severe bilateral neural foraminal narrowing at L4–5; flattening of the anterior cord with severe bilateral neural foraminal narrowing at C5–6; flattening of the anterior cord with moderate right and

severe left neural foraminal narrowing at C6–7; and moderate left neural foraminal narrowing at C7–T1. Tr. at 362–63.

On May 29, 2019, James Behr, M.D. ("Dr. Behr"), administered a right L4–5 transforaminal epidural steroid injection ("ESI"). Tr. at 465.

On June 25, 2019, Plaintiff reported having obtained no relief from the lumbar ESI. Tr. at 461. She described pain in her lower back that radiated to her right buttock and lateral right leg and rated her pain as a seven on a 10-point scale. *Id.* Physician assistant Megan Nicholas ("PA Nicholas") observed Plaintiff to demonstrate intact sensation to light touch throughout and 5/5 strength in the BUE and BLE, except for 4+/5 strength with left biceps and right wrist flexion. Tr. at 463. She refilled Norco and advised Plaintiff to proceed with a scheduled cervical ESI. *Id.*

On August 5, 2019, Dr. Behr administered a right C7–T1 interlaminar ESI. Tr. at 460.

On August 22, 2019, Plaintiff reported the cervical ESI provided no relief and exacerbated her pain. Tr. at 456. She described posterior neck pain that radiated down her bilateral upper trapezii, midline low back pain, and a tickling sensation in her right calf area. *Id.* She rated her pain as a seven and said she sometimes took two Norco tablets at a time, instead of the one tablet prescribed. *Id.* Dr. Lim noted Plaintiff was TTP in her cervical and lumbar spinous processes, had 4+/5 strength with left biceps and right wrist flexion,

demonstrated 5/5 strength otherwise throughout the BUE and BLE, and had intact sensation to light touch in the BUE and BLE. Tr. at 458. He advised Plaintiff of conservative and surgical options and offered to proceed with anterior cervical discectomy and fusion ("ACDF") from C4 to C7 due to multilevel stenosis. *Id.* Plaintiff expressed a desire to proceed with surgery. *Id.* Dr. Lim prescribed Norco 5-325 mg twice daily, as needed for pain. *Id.*

Plaintiff presented to NP Malone for a preoperative visit on September 4, 2019. Tr. at 290. She reported doing well overall, despite lumbar and cervical pain. *Id.* NP Malone recorded normal findings on physical exam. Tr. at 292. She noted a possible thyroid issue and ordered a thyroid-stimulating hormone test. Tr. at 293.

Plaintiff presented to physician assistant Rebecca Lehman ("PA Lehman") for a preoperative visit on September 19, 2019. Tr. at 451. She continued to describe neck pain that radiated to her bilateral upper trapezii. *Id.* She requested to cancel the surgery scheduled for September 25 due to personal and family issues. *Id.* PA Lehman noted Plaintiff demonstrated TTP in the cervical and lumbar spinous processes and had 4/5 strength with left biceps and right wrist flexion. Tr. at 454. She indicated she would refill Norco "one last time" and refer Plaintiff to pain management. *Id.*

Plaintiff presented to pain management physician Anthony Paul DiNicola, M.D. ("Dr. DiNicola"), to establish treatment on October 30, 2019.

8

Tr. at 444. She reported a three-year history of neck and back pain. *Id.* She rated her pain as a nine at worst and a seven on average. *Id.* She indicated her pain increased if she sat or stood too long or walked too far. *Id.* Dr. DiNicola observed pain with cervical and lumbar flexion and extension, positive straight-leg raise ("SLR") bilaterally, and positive Spurling's test bilaterally. Tr. at 446. He assessed cervical stenosis, cervical radiculopathy, lumbar stenosis, and lumbar spondylosis. Tr. at 447. He increased Norco to 7.5-325 mg three times a day, as needed. *Id.*

Plaintiff followed up with Dr. DiNicola for neck and back pain on November 26, 2019. Tr. at 439. She reported overall good benefit with Norco 7.5-325 mg and denied side effects. *Id.* Dr. DiNicola noted pain with cervical and lumbar flexion and extension, positive Spurling's test bilaterally, and positive bilateral SLR. Tr. at 441. He refilled Norco 7.5-325 mg and provided samples of Lyrica 50 mg for Plaintiff to use at night. *Id.*

Plaintiff reported her pain as a seven on December 5, 2019. Tr. at 434. Dr. Lim noted she had twice scheduled and cancelled surgery. *Id.* He indicated Plaintiff was TTP in the cervical and lumbar spinous processes and had 4+/5 strength with left biceps and right wrist flexion. *Id.* Plaintiff again expressed a desire to proceed with surgery. Tr. at 437.

Plaintiff visited PA Lehman for a preoperative evaluation on January 21, 2020. Tr. at 428. She complained of neck pain that radiated to her

bilateral shoulders and arms. *Id.* PA Lehman noted Plaintiff was TTP in the cervical and lumbar spinous processes and had 4+/5 strength to left biceps and right wrist flexion. Tr. at 430. Plaintiff planned to proceed with surgery. Tr. at 431.

On January 29, 2020, Dr. Lim performed ACDF with anterior plating at the C4, C5, C6, and C7 levels of Plaintiff's spine. Tr. at 280. The following day, Plaintiff rated her neck pain as an eight. Tr. at 284. Dr. Lim discharged Plaintiff with restrictions of no bending, twisting, or lifting greater than 10 pounds. Tr. at 283, 289.

On February 14, 2020, Plaintiff presented to PA Lehman for a postoperative evaluation. Tr. at 421. She described pain in her neck and arms and difficulty swallowing, but reported overall improvement. *Id.* She endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 422. Her incision was healing well, and she demonstrated 5/5 strength and intact sensation to light touch in her upper extremities. Tr. at 423. PA Lehman continued the postoperative restrictions and instructed Plaintiff to continue to wear the cervical collar and to return in four weeks. *Id.*

Plaintiff followed up with Dr. DiNicola on February 26, 2020. Tr. at 413. She complained that Norco 7.5-325 mg was only lasting for an hour or two at a time and was not as helpful as Oxycodone had been. *Id.* She

endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 414. Dr. DiNicola noted pain with cervical flexion and extension, positive Spurling's test bilaterally, pain with lumbar flexion and extension, and positive bilateral SLR. Tr. at 415. He discontinued Norco and prescribed Percocet 7.5-325 mg three times a day, as needed for pain. Tr. at 416.

Plaintiff presented to Dr. Lim for post-surgical follow up on March 12, 2020. Tr. at 409. She reported good and bad days and described an intermittent stinging/burning sensation around her incision site and pain between her shoulder blades and in her hands. *Id.* She endorsed headaches, numbness, and depression. Tr. at 410. Dr. Lim noted Plaintiff was wearing a neck brace and demonstrated 5/5 strength and intact sensation to light touch in her BUE. Tr. at 411. He stated x-rays of Plaintiff's cervical spine showed good alignment and stable hardware placement. *Id.* He continued restrictions of no bending, twisting, or lifting greater than 10–15 pounds. *Id.* He ordered a bone growth stimulator. *Id.*

Plaintiff returned to Dr. Lim on April 23, 2020. Tr. at 405. She indicated her neck felt weak and she had yet to obtain a bone graft stimulator. *Id.* She reported her preoperative radicular symptoms had otherwise resolved. *Id.* She endorsed headaches, numbness, and depression. Tr. at 406. Dr. Lim observed Plaintiff to demonstrate 5/5 strength and intact

sensation to light touch in her BUE. Tr. at 407. He noted Plaintiff was nontender to palpation over the cervical spinous processes and paraspinals. *Id.* He stated Plaintiff could start to return to her normal activities, including bending, twisting, lifting, and taking nonsteroidal anti-inflammatory drugs ("NSAIDs"). *Id.* He offered physical therapy, but Plaintiff declined it. *Id.*

Plaintiff followed up with Dr. DiNicola for pain management treatment on May 6, 2020. Tr. at 400. She reported benefitting from taking Percocet 7.5-325 mg three times a day and denied side effects. *Id.* However, she indicated she had discontinued Tizanidine, as it had caused unpleasant side effects. *Id.* She endorsed some breakthrough pain, but indicated she was managing it well and improving. *Id.* Dr. DiNicola noted pain with cervical flexion and extension, positive Spurling's test bilaterally, pain with lumbar flexion and extension, and positive straight-leg raising ("SLR") test bilaterally. Tr. at 402. He refilled Percocet, discontinued Tizanidine, and instructed Plaintiff to return in 13 weeks. Tr. at 403.

State agency medical consultant Kimberley Patton, M.D. ("Dr. Patton"), completed a physical residual functional capacity ("RFC") assessment on June 15, 2020. Tr. at 78–81. She assessed Plaintiff's RFC as follows: occasionally lift and/or carry 10 pounds; frequent lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour workday; never crawl, lift overhead with the upper

extremities, or climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; and avoid even moderate exposure to vibration and hazards. *Id.*

On July 23, 2020, Plaintiff reported continued cracking and popping, but rare pain in her neck. Tr. at 508. She indicated most of her pain was in her right lateral hip, particularly upon walking long distances. *Id.* She endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 509. Dr. Lim noted Plaintiff ambulated with normal gait, was not TTP, and had 5/5 strength, intact sensation to light touch, and equal and appropriate reflexes in in her BUE. Tr. at 510. He stated Plaintiff was "doing quite well" and could "continue with her normal activities." *Id.*

Plaintiff reported pain over her right lateral hip on July 31, 2020. Tr. at 503. She indicated Percocet was effective, but did not last long enough. *Id.* She endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 504. Physician assistant Katherine H. Brooks ("PA Brooks") noted Plaintiff was using a walker, demonstrated pain with cervical and lumbar flexion and extension, had positive Spurling's test and SLR bilaterally, and was TTP over the right greater trochanter. Tr. at 505. PA Brooks refilled Percocet and added Voltaren gel and a Butrans 10 mcg patch. Tr. at 506. She indicated she would consider a right hip injection if Plaintiff's pain failed to improve. *Id.*

Plaintiff presented to psychologist Caleb Loring, IV, Ph.D. ("Dr. Loring"), for a consultative mental status exam on August 25, 2020. Tr. at 486. She reported her husband had driven her to the exam because she never went out alone, despite having a driver's license. *Id.* She endorsed anxiety, depression, chronic pain, DDD, and arthritis. *Id.* She reported infrequent crying spells, decreased appetite, avoiding crowds, and not wanting to go outside. Tr. at 487. Plaintiff endorsed abilities to perform indoor chores, manage money, and care for her own grooming and hygiene, but said she could not perform outdoor chores and had abandoned her shopping cart in a store when she felt overwhelmed. *Id.*

Dr. Loring noted Plaintiff was pleasant and cooperative throughout the exam, but "potentially could have been promoting some psychotic symptoms." Tr. at 486. He reviewed Plaintiff's medical records and noted they reflected "some depression for quite a while that is probably of a mild-to-moderate degree and inconsistent in its presentation." Tr. at 487. He observed Plaintiff to have adequate grooming and hygiene, very poor eye contact, good speech and language skills, unremarkable behavior, "tired and drained" affect, moderately dysphoric mood, linear and goal-directed thought process, and anxious thought content. *Id.* He specifically noted that when questioned about perceptual abnormalities, Plaintiff stated "I see shadows, sometimes I think I hear whispers, but not words." *Id.* He considered this to be a possible

promotion of symptoms, as Plaintiff did not appear to be psychotic. *Id.* He stated Plaintiff was alert and oriented, could immediately repeat three unrelated words, and recalled one of the three words after a brief delay. *Id.* He stated Plaintiff's insight and judgment appeared to be good and she was likely functioning in at least the low average range of intelligence. *Id.*

Dr. Loring indicated Plaintiff may be experiencing depression and anxiety that might interfere with her motivation to engage in activities. *Id.* He said Plaintiff's primary problem was pain. *Id.* He stated "it would seem as though [Plaintiff] would probably be better suited to work in a vocational environment with limited public contact." *Id.* However, he further noted there were no issues to suggest she would have problems interacting with coworkers and supervisors. *Id.* He stated Plaintiff "appears to be an individual who would be capable of learning simple tasks and completing them at an adequate pace with persistence in a vocational setting." *Id.* He noted Plaintiff's symptoms might improve if she were to receive treatment. *Id.* He considered Plaintiff capable of managing any funds she might be awarded. *Id.* He diagnosed persistent depressive disorder, unspecified anxiety disorder, and issues with chronic pain. Tr. at 488.

On September 9, 2020, state agency psychological consultant Larry Clanton, Ph.D. ("Dr. Clanton"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 76–77. He considered Listings

12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, and 12.07 for somatic symptom and related disorders. *Id.* He assessed Plaintiff as having mild difficulties understanding, remembering, or applying information and adapting or managing oneself and moderate difficulties interacting with others and concentrating, persisting, or maintaining pace. *Id.* Dr. Clanton completed a mental RFC assessment, noting Plaintiff's moderate limitations in her abilities to carry out detailed instructions and interact appropriately with the general public. Tr. at 81–83. He considered Plaintiff capable of performing simple, unskilled tasks and maintaining concentration and attention for periods of at least two hours, but felt she would perform best in situations that did not require ongoing interaction with the public. Tr. at 82–83.

On September 25, 2020, Plaintiff reported decreased pain upon taking Percocet, but noted it did not last very long. Tr. at 494. She stated she had been unable to fill the prescription for the Butrans patch due to its cost. *Id.* She endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 495. PA Brooks observed Plaintiff to demonstrate normal gait, pain with cervical and lumbar flexion and extension, positive SLR bilaterally, positive Spurling's test bilaterally, and to be TTP over the right greater trochanter. Tr. at 496. She increased Percocet 7.5-325 mg to four tablets per day, as needed for pain. Tr. at 501.

Plaintiff presented to nurse practitioner Heather Stokes ("NP Stokes") for a headache on September 30, 2020. Tr. at 712. She described the headache started seven days prior, located in the frontal and bilateral region, aching, pulsating, dull, aggravated by activity and bright light, and accompanied by insomnia, nausea, photophobia, and fatigue. *Id.* NP Stokes described Plaintiff as obese and ill-appearing. Tr. at 714. She assessed nausea and intractable migraine with status migrainosus. Tr. at 715. She prescribed Fioricet and Phenergan 12.5 mg and offered Plaintiff a Zofran injection that she declined. *Id.*

On December 16, 2020, Plaintiff reported good benefit and denied side effects from Percocet 7.5-325 mg four times a day, as needed. Tr. at 490. She described new-onset lateral hip pain and ongoing back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 490, 491. Dr. DiNicola noted Plaintiff was TTP over the right greater trochanter and demonstrated normal gait, pain with cervical and lumbar flexion and extension, positive Spurling's test bilaterally, and positive SLR bilaterally. Tr. at 492. He refilled Percocet. Tr. at 493.

On February 10, 2021, a second psychological consultant, Timothy Laskis, Ph.D. ("Dr. Laskis"), reviewed the record and reached the same conclusions as Dr. Clanton. *Compare* Tr. at 76–77 and 81–83, *with* Tr. at 96–98 and 104–07.

17

On February 11, 2021, a second state agency medical consultant, Ronald Collins, M.D. ("Dr. Collins"), assessed the same physical RFC as Dr. Patton. *Compare* Tr. at 78–81, *with* Tr. at 99–104.

Plaintiff also followed up with Dr. Lim on February 11, 2021. Tr. at 744. She reported occasional tightness in her neck, but said her neck was doing well overall. *Id.* She complained of pain in her left leg and low back. *Id.* Dr. Lim noted 5/5 strength in the BLE, except for 4/5 strength in the left tibialis and left extensor hallucis longus ("EHL"). Tr. at 746. He released Plaintiff as to her neck and ordered an MRI of her lumbar spine. *Id.*

On March 1, 2021, an MRI of Plaintiff's lumbar spine showed spurring and protrusion to the right with mild right neural foraminal narrowing and moderate canal narrowing at L2–3 and questionable minimal worsening since April 2019; mild right neural foraminal narrowing and mild canal narrowing at L3–4, unchanged from April 2019; right-sided protrusion abutting the right L4 root with mild-to-moderate bilateral neural foraminal narrowing and mild canal narrowing, unchanged from April 2019; and a new synovial cyst posterior to the left facet joint at L4–5. Tr. at 592.

On March 3, 2021, Plaintiff reported her neck pain was well-controlled on her medication regimen. Tr. at 740. She continued to endorse back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 741. Dr. DiNicola noted Plaintiff was TTP over the right greater trochanter, had pain

with cervical and lumbar flexion and extension, and demonstrated positive Spurling's and SLR tests bilaterally. Tr. at 742. He refilled Percocet. Tr. at 743.

Plaintiff followed up with Dr. Lim for increased back pain on March 4, 2021. Tr. at 736. She described pain that radiated from her lower back into her buttocks, posterolateral thighs, anterior shins, and toes. *Id.* She endorsed increased pain upon sitting up and reading in bed. *Id.* She stated she could not stand for long and had to change positions frequently. *Id.* Plaintiff also endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 737. Dr. Lim reviewed Plaintiff's most recent MRI. Tr. at 738. Plaintiff expressed a desire to hold off on further treatment options. *Id.*

On May 20, 2021, Plaintiff presented to the ER at SMC with complaints of rectal bleeding, lightheadedness, and nausea. Tr. at 617. She endorsed a history of gastric bypass. *Id.* The attending physician noted Plaintiff's hemoglobin was decreased, and prescribed ferrous sulfate. Tr. at 623. He discharged Plaintiff and instructed her follow up with a gastroenterologist. *Id.*

On May 26, 2021, Plaintiff reported good benefit and denied side effects from Percocet. Tr. at 731. She denied new complaints and endorsed back pain, arthritis, stiffness, headaches, numbness, and depression. Tr. at 731, 732. Dr. DiNicola observed Plaintiff to be TTP over the right greater

trochanter, ambulate with normal gait, have full ROM of the hip, endorse pain with cervical and lumbar flexion and extension, and demonstrate positive Spurling's and SLR tests bilaterally. Tr. at 733. He refilled Percocet. Tr. at 734.

### C.     The Administrative Proceedings

#### 1.     The Administrative Hearing

##### a.     Plaintiff's Testimony

At the hearing on July 27, 2021, Plaintiff testified she lived in a house with her husband and three children, ages 27, 21, and 14. Tr. at 43–44. She said she was 5'3" tall and weighed 225 pounds. Tr. at 44. She stated her weight had been consistent over the prior two years. *Id.* She indicated she was right-handed, had a driver's license, and continued to drive. Tr. at 45.

Plaintiff described work through SB Phillips Company, a staffing agency, in 2011. *Id.* She stated she had been placed in a job as a weaver. *Id.* She indicated she had last worked for Magna Seating of America, assembling car seats on an assembly line. Tr. at 46. She said she left the job due to pain. *Id.* She admitted she had subsequently searched for other jobs, but did so prior to the COVID-19 pandemic. *Id.*

Plaintiff testified she was unable to work due to extreme pain in her neck, back, and hip. *Id.* She stated her pain medication made her sleepy such that she napped off and on. *Id.* She said she felt depressed, but was not being

20

treated for depression. Tr. at 47. She indicated she had taken medication for depression in the past, but had discontinued it due to hallucinations. *Id.*

Plaintiff estimated she could stand for about 20 minutes at a time. *Id.* She said she could sit for 20 to 30 minutes without having to shift, stand, or walk. *Id.* She stated she could walk for 10 to 15 minutes at a time. *Id.* She indicated she could lift a gallon of milk, but it caused her pain. *Id.* She denied using a walker or cane. Tr. at 47–48. She said she could bend with her knees to pick up items that were not too heavy. Tr. at 48. She described her hands "go[ing] numb sometimes." *Id.* However, she admitted she had received no treatment for her hands. *Id.* She said she had sleep apnea that required use of a continuous positive airway pressure ("CPAP") machine. *Id.*

Plaintiff testified she made sandwiches and prepared small meals. *Id.* She said she could bathe and dress on her own, but did so slowly. Tr. at 49. She indicated her children did most of the household chores, but she did some light cleaning and would remove clean clothes from the dryer and fold them over a 20-minute period. Tr. at 49, 59. She stated she had to rest for an hour after folding laundry. Tr. at 59. She said she had difficulty walking through the grocery store and would typically prepare a list of groceries for her daughter to pick up. Tr. at 49. She stated that prior to the pandemic, her activities included attending church, visiting her mother, socializing with friends once a week, and going out to eat. Tr. at 50. She admitted she used a

cell phone and had a Facebook account. *Id.* She said she could no longer read for pleasure because of neck pain. Tr. at 59.

Plaintiff testified her medication made her feel sleepy and lasted for less than two hours. Tr. at 50–51. She said the medications sometimes made her feel lightheaded and nauseated, as well. Tr. at 57. She admitted she sometimes drank alcohol at night. Tr. at 51. She described activities of daily living ("ADLs") that included watching the news until she fell asleep, drinking coffee, making beds, taking her medication, napping, and "try[ing] to keep [her]self busy." *Id.* She said she had difficulty falling and staying asleep at night. Tr. at 58. She indicated she usually napped for 20 to 30 minutes at a time, two to three times during the day. Tr. at 58–59.

Plaintiff stated she would be unable to perform a less physically-demanding job than her prior work because it would still require bending, twisting, and lifting. Tr. at 52. She indicated she experienced pain after sitting for a period of time. *Id.* She said her fusion surgery had limited her ability to turn her neck and affected her abilities to drive, look up, and reach in all directions. Tr. at 52–53. She indicated she had limited ROM of her neck. Tr. at 53. She described her pain as radiating from her neck into her shoulders, upper arms, back, and the back of her arms. Tr. at 54. She said she experienced numbness in her feet for less than a minute, two to three

times a day. *Id.* She stated the numbness in her upper extremities caused her to drop items approximately three times a day. Tr. at 55.

Plaintiff confirmed that she had participated in physical therapy following her January 2020 cervical fusion surgery, but had received no benefit from it. Tr. at 55–56. She stated her pain was somewhat alleviated by use of a massaging heating pad several times throughout the day. *Id.* She confirmed she had received two injections in her lower back and two in her neck that had provided no relief. *Id.* She stated she was no longer using a CPAP machine because her insurance provider declined to cover it and she could not afford to pay for it on her own. Tr. at 57. She indicated she experienced daily pain. Tr. at 60. She said she had been taking Percocet 7.5 mg, four times a day, for over a year, had previously taken Norco 10 mg, three times a day, and had initially taken Norco 5 mg, three times a day. Tr. at 60–61.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Linda Lyons reviewed the record and testified at the hearing. Tr. at 61–70. The VE categorized Plaintiff's PRW as a weaver, *Dictionary of Occupational Titles* ("*DOT*") No. 763.684-018, requiring light exertion and a specific vocational preparation ("SVP") of 3. Tr. at 63. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift up to 10 pounds occasionally; stand or walk for approximately two hours

in an eight-hour workday; sit for approximately six hours in an eight-hour workday; never crawl, reach overhead, or climb ladders, ropes, or scaffolds; occasionally stoop, crouch, kneel, and climb ramps and stairs; and occasionally be exposed to unprotected heights, use of moving machinery, and excessive vibration. Tr. at 63. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 65. The ALJ asked whether there would be any other jobs the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of 2 as a lube operator, *DOT* No. 239.687-014, a call-out operator, *DOT* No. 237.367-014, and an addresser, *DOT* No. 209.587-010, with 10,000, 12,000, and 20,000 positions in the national economy, respectively. Tr. at 65–66.

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first hypothetical, would be off-task 20% or more of the workday, and would be absent on more than three days per month. Tr. at 66. He asked if there would be jobs available to someone with those limitations. *Id.* The VE testified the additional restrictions would eliminate all jobs in the national economy. Tr. at 67.

The ALJ asked the VE to review her testimony and identify any conflicts between the jobs she identified and the information in the *DOT*. Tr. at 67. The VE testified the *DOT* did not address bilateral reaching, absences,

24

and time off-task. *Id.* She indicated that, based on her experience, the identified jobs could be performed with the specified restrictions. *Id.*

Plaintiff's counsel asked the VE if either being off-task for 20% of the workday or being absent more than three times per month would individually preclude competitive employment. *Id.* The VE confirmed that either restriction would eliminate all jobs. Tr. at 68. She explained that employers generally accepted an employee being off-task for 10 percent of the workday or absent on one day per month. *Id.* In response to counsel's subsequent questions, the VE stated that if an individual were limited to working for less than eight hours or required more than the standard break periods, it would eliminate all jobs in the economy. Tr. at 68–69.

Plaintiff's counsel noted that the VE also performed rehabilitative job placement. Tr. at 69. He asked the VE if she would be able to place an individual in a job who required medication four times a day. *Id.* The VE testified the determination would be on a case-by-case basis and dependent on the medical records and potential danger to the individual. *Id.*

### 2.    The ALJ's Findings

In his decision dated August 3, 2021, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2020.
2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 20, 2019

through her date last insured of December 31, 2020 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: spine disorder, dysfunction of a major joint (hip) and obesity (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). The claimant is able to lift up to ten pounds occasionally and stand or walk for about two hours in an eight-hour workday and sit for up to six hours in an eight-hour workday. The claimant can never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, stoop, crouch and kneel, and never crawl. She can never perform bilateral overhead reaching. She can have occasional exposure to excessive vibration, occasional use of moving machinery and occasional exposure to unprotected heights.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on July 26, 1972 and was 48 years old, which is defined as a younger individual age 45–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 20, 2019, the alleged

onset date, through December 31, 2020, the date last insured (20 CFR 404.1520(g)).

Tr. at 17–29.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not include all necessary restrictions in the RFC assessment because he failed to properly evaluate Plaintiff's subjective allegations as to reaching restrictions; and

2)    the ALJ failed to properly evaluate the medical opinions of record and incorporate them into the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65

(4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

>    2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is

rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Subjective Allegations

Plaintiff argues the ALJ erred in assessing an RFC that failed to account for her credible subjective complaints. [ECF No. 15 at 3]. She specifically maintains the ALJ failed to restrict her to jobs that limited reaching in all directions, not just overhead. *Id.* at 7–8. In her reply brief, Plaintiff argues that to the extent the ALJ cited evidence that discounted reaching restrictions, he failed to provide reasons for finding she could never reach overhead, but had unlimited ability to reach in any other direction. [ECF No. 17 at 2]. She contends the ALJ did not meet his duty to properly explain his conclusions in light of all the evidence. *Id.*

The Commissioner argues the ALJ properly considered the entire record in evaluating Plaintiff's subjective complaints. [ECF No. 16 at 10–12]. She asserts the ALJ considered Plaintiff's history of neck pain, post-surgical evidence of resolution of radicular symptoms, full strength in her upper extremities, intact sensation and neurovascular responses, equal and

31

appropriate reflexes, and her doctor's authorization to resume normal activities. *Id.*

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). Upon concluding that the impairment could reasonably produce the symptoms the claimant alleges, the ALJ is to proceed to the second step, which requires him to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

An ALJ "improperly increase[s]" the claimant's "burden of proof" where he requires a claimant's subjective description of symptoms to be verified by objective medical evidence. *Lewis*, 858 F.3d at 866. Thus, if an ALJ concludes a claimant has a severe impairment that could reasonably cause the symptoms she alleges, he is not permitted to reject her allegations as to the functional limitations her impairment imposes simply because there are not

enough clinical signs and laboratory findings to support the severity she alleges.

However, this does not mean an ALJ is required at the second step to accept every representation a claimant makes regarding the intensity, persistence, and limiting effects of her symptoms. The ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4). The ALJ should examine "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2017 WL 5180304, at *6. These factors include: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his

back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ is required to explain which of the claimant's alleged symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. He must include a narrative discussion explaining the restrictions included in the RFC assessment and referencing specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including ADLs and observations. SSR 96-8p, 1996 WL 374184, at *7. The ALJ "must explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "Courts have interpreted the explanation requirement as imposing a duty on the ALJ to "build an accurate and logical bridge" between the evidence and the conclusions as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Afpel*, 277 F.3d 863, 872 (7th Cir. 2000)). [R]emand may be appropriate where an ALJ fails to

assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The ALJ provided in the RFC assessment that Plaintiff could "never perform bilateral overhead reaching." Tr. at 21. He did not specifically address Plaintiff's testimony that she had difficulty reaching in front and to the side, Tr. at 53, or explicitly reject the notion that she had difficulty reaching in all directions. However, he generally rejected Plaintiff's allegations of additional functional restrictions, writing: "The medical evidence [was] consistent with the residual functional capacity as set forth above" and "[c]onsequently, such evidence does not reflect the level of functional restriction asserted by the claimant." Tr. at 22. He found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. at 24.

In discussing specific evidence of impairment to Plaintiff's cervical spine and its functional effects, the ALJ wrote: "She had some pain with range of motion in her neck but this improved following surgery, she had

normal range of motion in her upper extremities, she had full strength in the upper extremities, she had intact sensation, and her reflexes were symmetrical (Exhibits 2F, 5F, 7F, 9F)." Tr. at 25. He stated this evidence supported Plaintiff's "ability to perform sedentary work with no overhead reaching, limited postural activities, limited exposure to excessive vibration and occasional exposure to hazards." *Id.* He further noted successful surgery for Plaintiff's neck, her minimal complaints of neck pain, and her release from care for her neck. *Id.* He referenced Plaintiff's ADLs, which included bathing, dressing, and feeding herself, driving, preparing her own meals, cleaning up after herself, and performing light household chores, such as loading the washing machine and folding clothes. *Id.* Thus, the ALJ examined more than the objective medical evidence in rejecting some of Plaintiff's subjective allegations, noting her representations to her providers, her providers' impressions, and her ADLs.

Contrary to Plaintiff's assertion, the ALJ provided an adequate explanation for his inclusion of an overhead reaching restriction and his exclusion of additional reaching restrictions. The ALJ acknowledged that the record contained medical opinion evidence supporting the overhead reaching restriction. Tr. at 27. Drs. Patton and Collins specified that Plaintiff should never perform overhead reaching due to multi-level cervical spinal fusion. Tr. at 78–80, 101–02. They did not indicate Plaintiff would be limited in her

ability to reach in any direction other than overhead. *See id.* The ALJ considered their conclusions that Plaintiff was "limited to sedentary work with limited overhead reaching" to be "persuasive as supported by explanation and consistent with the claimant's history of cervical fusion with improvement following same, as evidenced by diagnostic tests showing stable fusion and objective exams showing good range of motion, with full strength in the upper extremities, intact sensation and normal reflexes." Tr. at 27. Thus, the ALJ included a specific restriction as to overhead reaching based on the state agency medical consultants' opinions that such a restriction was necessary in light of Plaintiff's history of cervical fusion.

Although the ALJ did not explicitly state that he had rejected Plaintiff's allegations as to difficulty reaching in all directions, he adequately explained his reasons for declining to include additional restrictions, specifically those she attributed to her history of cervical impairment and fusion surgery. Plaintiff's testimony was the only evidence that supported her allegation of impaired reaching ability in other directions.[4] In light of the

---

[4] Plaintiff submits her pain management physician's observations of pain with cervical flexion and extension and positive Spurling's test bilaterally support additional reaching restrictions. [ECF No. 15 at 7–8]. Cervical flexion is "bending the head forward towards the chest" and cervical extension is "bending the head backward with the face toward the sky." Benjamin Jung and Beenish S. Bhutta, *Anatomy, Head and Neck, Neck Movements*, StatPearls, Updated July 19, 2022, https://www.ncbi.nlm.nih.gov/books/NBK557555/. "A Spurling Maneuver is a clinical test that is performed by bending a patient's head backwards and sideways while exerting downward

foregoing, the court finds substantial evidence supports the ALJ's consideration of Plaintiff's subjective allegations in assessing her reaching ability as part of the RFC assessment.

### 2.    Medical Opinions

Plaintiff argues the ALJ failed to properly weigh the medical opinions and account for them in the RFC assessment. [ECF No. 15 at 8–9]. She maintains the ALJ improperly discounted the opinions of Dr. Loring and the state agency psychological consultants and, consequently, declined to incorporate mental restrictions in the RFC assessment. *Id.* at 12–14. She contends the ALJ improperly substituted his opinion for opinions of those qualified to make psychological assessments. *Id.* at 14. She claims the ALJ should not have discounted Drs. Loring's, Clanton's, and Laskis's opinions based on her lack of treatment and normal mental status exams because they had reviewed the medical evidence and were aware of these factors when they rendered their opinions. *Id.* at 14–15. She asserts the ALJ ignored the consistency of the three psychologists' opinions. [ECF No. 17 at 3].

The Commissioner argues the ALJ adequately explained his reasons for concluding Dr. Loring's and the state agency consultants' opinions were not

---

pressure on the head." *Rivera v. U.S.*, C/A No. 10-5767 (MHD), 2012 WL 3132667, at *19 n.44 (S.D.N.Y. July 31, 2012) (citing doctor's deposition testimony). Because these maneuvers involve specific upward and downward neck motions that do not mimic reaching, the  undersigned is not persuaded by Plaintiff's argument that these signs support further restriction to her reaching ability.

persuasive. [ECF No. 16 at 14–15]. She maintains the ALJ cited to the record to support his conclusions that Dr. Loring's opinion was not supported by the consultative exam or consistent with the other evidence. *Id.* She contends the ALJ noted the state agency consultants' opinions were inconsistent with the other evidence and lacked sufficient explanation. *Id.* at 15.

ALJs must consider the persuasiveness of all the medical opinions of record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1520c(b), (c). However, they are only required to explicitly discuss the supportability and consistency of each medical source's opinion, as these factors are considered most important in assessing its persuasiveness. 20 C.F.R. § 404.1520c(a), (b)(2). In evaluating the supportability factor, the regulations direct ALJs to consider medical opinions more persuasive based on "the more relevant . . . objective medical evidence and supporting explanations" the medical source provides. 20 C.F.R. § 404.1520c(c)(1). They guide ALJs in assessing the consistency factor to consider an opinion more persuasive if it is consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2).

Although ALJs have discretion in evaluating the persuasiveness of medical opinions, substantial evidence must support the ALJ's conclusions as

to the supportability and consistency of those opinions. If the ALJ materially errs in evaluating these factors, the court may remand the case. *See Flattery v. Commissioner of Social Security Administration*, C/A No. 9:20-2600-RBH-MHC, 2021 WL 5181567, at *8 (D.S.C. Oct. 21, 2021), (concluding substantial evidence did not support the ALJ's evaluation of the supportability factor where he ignored the claimant's continuing treatment with the medical provider and portions of the provider's treatment notes), adopted by 2021 WL 5180236 (Nov. 8, 2021); *Joseph M. v. Kijakazi*, C/A No. 1:20-3664-DCC-SVH, 2021 WL 3868122, at *13 (D.S.C. Aug. 19, 2021) (finding the ALJ erred in assessing a medical opinion pursuant to 20 C.F.R. § 404.1520c and § 416.920c because he misconstrued the date the plaintiff last saw the medical provider, neglected the continuing treatment relationship, and erroneously claimed the last treatment visit was prior to the plaintiff's alleged onset date), adopted by 2021 WL 3860638 (Aug. 30, 2021). The ALJ is not allowed to cherry-pick the record, referencing only the evidence that supports his conclusion as to the persuasiveness of the medical opinion and ignoring evidence to the contrary. *See Lewis*, 858 F.3d at 869 (providing an "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability while ignoring evidence that points to a disability finding") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)); *see also Robinson v. Saul*, C/A No. 0:20-1860-RMG-PJG, 2021 WL

2300809, at *4–5 (D.S.C. May 25, 2021) (remanding case where the ALJ ignored treatment records supporting the medical provider's opinion), adopted by 2021 WL 2291834 (D.S.C. June 4, 2021). An ALJ also errs to the extent that he substitutes his opinion for the uncontradicted opinion of a medical expert when evaluating the significance of clinical findings. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

The ALJ specifically considered Dr. Loring's opinion in explaining the RFC assessment. He wrote:

> On August 25, 2020, consultative examiner, Dr. Loring, opined the claimant would probably be better suited for work with limited public contact, and she would be capable of learning simple tasks and completing them at an adequate pace with persistence in a vocational setting (Exhibit 4F, p. 2). This is not persuasive as it was based on a one-time exam and the supporting explanation acknowledges that the claimant has not received treatment and would likely improve with same. Moreover, this appears to be largely based on the claimant's subjective reports, rather than objective findings, as the longitudinal record shows normal mood and affect with normal behavior. The claimant's reports at this examination are not consistent with the medical record or her testimony that she drives and goes shopping in stores and can function independently outside of the home. The record does not support the claimant would be limited to simple work or have social limitations, as this is further inconsistent with her lack of any treatment as well as her ability to get together with family, go to church and go out to eat.

Tr. at 26–27. Although the ALJ did not specifically use the words "supportability" and "consistency" in this explanation, he considered the factors, as he referenced findings from the exam and the record as a whole in

41

reaching his conclusion as to the persuasiveness of Dr. Loring's opinion. *Id.*

He also addressed the "relationship" factor, noting this was a one-time exam.

*See* Tr. at 26.

> The ALJ addressed Drs. Clanton's and Laskis's opinions as follows:
>
> DDS further determined the claimant had severe impairments. This is not persuasive as this is not supported by adequate explanation or consistent with the longitudinal record showing the claimant had no formal mental health treatment and her mental status exams were normal, with normal mood and affect, normal behavior, normal attention and normal judgment (Exhibits 5F, 8F, 9F). This is further not consistent with the claimant's daily activities, including her ability to care for herself, prepare her own meals, perform some light household chores, read, go out to eat, drive, and manage her own finances (Exhibits 5E, 6E).

Tr. at 27. The ALJ's explanation reflects his consideration of the supportability factor, as he noted Drs. Clanton and Laskis did not thoroughly explain their conclusions. *See id.* He also addressed the consistency factor, finding their opinions were not consistent with Plaintiff's lack of mental health treatment and findings during other providers' exams. *See id.*

Earlier in the decision, the ALJ provided additional clarification of his conclusions as to Drs. Loring's, Clanton's, and Laskis's opinions, writing:

> The claimant's medically determinable mental impairments of anxiety and depression did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere. The claimant no longer takes medications for this and does not receive any formal mental health treatment.

> On August 25, 2020, the claimant presented for a psychological consultative evaluation with Caleb Loring, IV, Ph.D. with reports of chronic pain, anxiety and depression (Exhibit 4F). She reported previously taking medications but that they did not help her and she denied any therapy (Exhibit 4F, p. 1). She reported that she had a driver's license but did not go out alone, she could do indoor chores, she only shopped if she had to but sometimes left if she felt overwhelmed, she could manage money and prepare meals, she could perform self-care and she reported that sometimes she takes pain meds. A mental status exam revealed the claimant had poor eye contact but normal speech, her behavior was unremarkable, her mood was described as tired, her affect was dysphoric, her thought process was normal, her recall was intact, her concentration was intact, her insight and judgment were fair to good and she was functioning in the low average range. It was felt that there could be some promotion of symptoms. It was felt that the claimant may have [to] deal with some mild to moderate inconsistent depression and anxiety throughout her life which interfered with her motivation to engage in some activities of daily living (Exhibit 4F, p. 2).
>
> Other than during her psychological consultative evaluation with Dr. Loring, her mental status exams have been normal, with normal mood and affect, normal attention, normal speech, normal behavior and normal cognition (Exhibit 8F, 9F).

Tr. at 18–19.

The ALJ stated he had further considered the "areas of mental functioning set out in the disability regulations for evaluating mental disorders and the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1)." Tr. at 19. He assessed no limitation in Plaintiff's ability to understand, remember, or apply information, noting she had alleged she had difficulty completing tasks, but "also stated that she could perform simple maintenance, prepare meals, pay bills, go to doctor's appointments, take

medications, shop, drive, and read." *Id.* He further noted the record showed Plaintiff "was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers, and there is no mention of any issues with the claimant's short- or long-term memory." *Id.*

The ALJ assessed no limitation in Plaintiff's ability to interact with others. *Id.* He acknowledged Plaintiff's allegation that she had difficulty engaging in social activities, but noted her statements that she could "get along with others, shop, spend time with friends and family, attend church, deal appropriately with authority, and live with others." *Id.* He noted the medical evidence showed Plaintiff "had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments." *Id.* He further observed that Plaintiff "interacted appropriately at the hearing." *Id.*

The ALJ found Plaintiff had mild limitations in her ability to concentrate, persist, or maintain pace. *Id.* He addressed Plaintiff's assertion that she had "limitations in completing tasks and maintaining a regular work schedule," but noted her reported abilities to drive, prepare meals, watch TV, read, manage funds, use the internet, handle her own medical care, and attend church." *Id.* He pointed out that "the record fail[ed] to show any

mention of distractibility and an inability to complete testing that assessed concentration and attention." *Id.* He cited Plaintiff's ability to attend to and answer questions during the hearing. *Id.*

The ALJ assessed no limitation in Plaintiff's ability to adapt or manage oneself, despite her allegations that she had difficulty managing her mood. *Id.* He referenced her statements that she could handle self-care and personal hygiene and objective evidence showing her to have appropriate grooming and hygiene, no problems getting along well with providers and staff, normal mood and affect, and no problems with temper control. Tr. at 19–20. He stated Plaintiff's judgment and insight were intact and she could "function independently outside the home." Tr. at 20.

Contrary to Plaintiff's argument, the ALJ did not isolate a single variable out of context or "play doctor" in concluding Drs. Loring's, Clanton's, and Laskis's opinions were not persuasive. The detailed explanation above reflects the ALJ's thorough evaluation of the entire record. He cited Plaintiff's self-reported activities and impressions of her mental status from her providers that were inconsistent with the psychologists' opinions.

Although the three psychologists reached similar conclusions, Drs. Clanton and Laskis, the non-treating, non-examining consultants, plainly stated that they based their opinions on Dr. Loring's consultative exam findings and conclusions. *See* Tr. at 77, 97. The record admittedly contains no

medical opinion to rebut the psychologists' opinions, but they are not uncontradicted, as reflected in the ALJ's explanation.

Furthermore, Dr. Loring acknowledged potential flaws in his opinion, noting Plaintiff's potential promotion of more severe symptoms than those she had actually experienced. Tr. at 486, 487. While he stated Plaintiff "appear[ed] to be an individual who would be capable of learning simple tasks and completing them at an adequate pace with persistence in a vocational setting," he did not specifically indicate an impression that this was the most Plaintiff could do, which is highly relevant to an RFC assessment.[5]

In light of the ALJ's thorough explanation for his conclusions, the undersigned finds substantial evidence supports his evaluation of the medical opinions and his decision not to include mental functional limitations in the RFC assessment.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

---

[5] A claimant's RFC represents the *most* she can still do, despite limitations imposed by her impairments and symptoms. 20 C.F.R. § 404.1545(a) (emphasis added).

IT IS SO ORDERED.

December 27, 2022                    Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge